**JUDGE DANIELS**   13 CV 8947

Miriam Clark (MFC 2860)
Ritz Clark & Ben-Asher LLP
Attorneys for Plaintiff
59 Maiden Lane, 39th Floor
New York, NY 10038
(212) 321 – 7075
mclark@rcbalaw.com.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
KEMP ROELOFS,

              Plaintiff

      -against-

435 EAST 85TH STREET TENANTS CORP;
HALSTEAD PROPERTY, LLC;
HALSTEAD MANAGEMENT
COMPANY, LLC;
PENMARK MANAGEMENT, LLC;
TERRA HOLDINGS, LLC;
MICHAEL GOBERDHAN;
and
MICHAEL GERMANO,

              Defendants.
-----------------------------------------------------------X

COMPLAINT
WITH JURY DEMAND



      Plaintiff Kemp Roelofs ("Plaintiff" or "Roelofs"), through his attorneys, Ritz Clark & Ben-Asher LLP, complaining of Defendants alleges:

1

## NATURE OF ACTION

1. This is an action based on claims of failure to pay overtime; violation of New York State Labor Law and retaliation committed by Defendants pursuant to:

   (i) the Fair Labor Standards Act ("FLSA") and

   (ii) the New York Labor Law;

2. Plaintiff seeks declaratory and injunctive relief, compensatory, liquidated and punitive damages, lost wages and benefits, costs and attorney's fees and all other appropriate legal and equitable relief.

## JURISDICTION AND VENUE

3. The Court has jurisdiction of this matter pursuant to 29 U.S.C. § 201, *et seq.*; 29 U.S.C. § 216, 28 U.S.C. § 1331 and 28 U.S.C. § 1337(a). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. 1367. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(i) and (ii) because Defendants maintain their principal places of business in this district, Plaintiff was employed by the Defendants in this district, and the actions complained of were conducted within this district.

## THE PARTIES

PLAINTIFF

4. Plaintiff resides in the County of Queens, City of New York, State of New York. Plaintiff worked for Defendants from about February 1995 through April 2013. His primary duties consisted of building maintenance. In carrying out his duties for Defendants, Plaintiff handled or worked with goods that are moved in, or produced for,

interstate commerce and had significant interaction with out-of-state vendors and out-of-state absentee shareholders. The goods, supplies and services purchased from out-of-state vendors included, but were not limited to, fuel oil, elevator service, boiler operation and service, laundry room equipment and service, light fixtures, and sanitation services. Out-of-state goods purchased and used by Plaintiff in the course of carrying out his responsibilities to Defendants included, but were not limited to, pelletized calcium chloride, air valves for the steam heating system, pumps and pump repair parts, light bulbs, faucet and shower body parts, flushometers, fuses, and fire extinguishers. Plaintiff's duties further involved significant interaction with the Coop's out-of-state owners while they were out-of-state. On information and belief, and at all times relevant herein, at least 12 out of 70 of the Coop's apartments were owned by persons who maintained primary residences out-of-state. Plaintiff's duties also entailed significant out-of-state interactions with owners who maintained secondary residences out of state, while such owners were in their out-of-state residences. These required out-of-state interactions included, but were not limited to, long distance phone calls and emails involving requests for Plaintiff to perform services for the out-of-state shareholders, such as Coop Board vice president Michael Ardisson calling Plaintiff from out of state to instruct that he arrange for an exterminator to check Mr. Ardisson's apartment (in which a subtenant was residing) for bed bugs and requiring Plaintiff to "front" the $75 cost for him, which Plaintiff did. Plaintiff did not, at any time relevant herein, supervise any employees or exercise independent discretion and/or judgment.

DEFENDANTS

5. On information and belief, and at all times relevant herein, Defendant 435 East 85th Street Tenants Corporation (hereinafter "Coop") was and is a cooperative housing corporation incorporated in the State of New York, located at 435 East 85th Street, New York, New York, comprised of approximately 70 units in five floors. On information and belief, the Coop's revenue during all relevant periods exceeded $500,000. During the period of time from approximately September 2010 to approximately August 2012, Defendants employed a porter to work at Defendant Coop in addition to Plaintiff.

6. On information and belief, from approximately June 2012 to approximately December 2013, Defendant Michael Germano resided at 435 E. 85 St., Apt. 1-N, New York, New York, and was the President of the Board of Directors of the Coop ("Coop Board"). Defendant Germano, an officer of Defendant Coop, had operational control of the Coop's enterprise and exercised control over all aspects of Plaintiff's employment along with Defendants Halstead, Coop and Goberdhan.

7. On information and belief, and at all times relevant herein, Defendant Halstead Property, LLC was and is a New York Domestic Limited Liability Company.

8. On information and belief, and at all times relevant herein, Defendant Halstead Management Company, LLC was and is a New York Domestic Limited Liability Company.

9. On information and belief, and at all times relevant herein, Defendant Penmark Management, LLC was and is a New York Domestic Limited Liability Company.

10. On information and belief, and at all times relevant herein, Defendant Terra Holdings, LLC was and is a New York Domestic Limited Liability Company. Defendants

4

Terra Holdings, LLC, Halstead Property Management, Halstead Management and Penmark Management constitute an integrated enterprise consisting of four nominally distinct entities: Halstead Property Management, Terra Holdings, LLC, Halstead Management and Penmark Management, all of which engage in property management.

11. On information and belief, and at all times relevant herein, Defendants Halstead Property Management, Terra Holdings, LLC, Halstead Management and Penmark Management operated, and continue to operate, out of joint offices located at 770 Lexington Avenue, 7th floor, New York, New York. On information and belief, at all times relevant herein, almost all the employees of Defendants Halstead Property Management, Terra Holdings, LLC, Halstead Management and Penmark Management worked interchangeably for both companies.

12. On information and belief, and at all times relevant herein, Halstead Property Management, Halstead Management, Terra Holdings and Penmark Management shared and continue to share equipment, vehicles, the same office, and the same office personnel.

13. Defendants Halstead Property, Halstead Management Company, Terra Holdings, LLC and Penmark Management, LLC are hereafter referred to collectively as "Halstead." On information and belief, and at all times relevant herein, Halstead's annual revenues exceeded $500,000 a year. On information and belief, and at all times relevant herein, Halstead managed and continues to manage properties in New York, New Jersey and Connecticut. On information and belief, and at all times relevant herein, Halstead had and continues to have more than 500 employees. At all times relevant herein, Halstead was and is engaged in interstate commerce within the meaning of the FLSA.

14. On information and belief, from about June 2011 to the present, Defendant Michael Goberdhan was and is employed by Defendant Halstead as the Managing Agent of the Coop. On information and belief, at all times relevant herein, Defendant Goberdhan exercised control over all aspects of Plaintiff's employment along with Coop, Germano and Halstead.

15. Defendants Coop, Halstead, Germano and Goberdhan were Plaintiff's joint employers during the relevant time period. Defendants had joint control over all aspects of Plaintiff's job including but not limited to, hiring, pay, records and supervision. On information and belief and at all times relevant herein, examples of Defendants' joint employment responsibilities included, but were not limited to: Defendant Halstead maintained Plaintiff's employment records; Defendant Halstead required that Plaintiff be paid weekly and by direct deposit; Plaintiff's rate of pay and the rate of pay of the Coop's other employees were determined jointly by Defendants Coop, Germano, Halstead and Goberdhan; Defendants Halstead and Goberdhan acted jointly as Plaintiff's primary supervisor, requiring that he attend meetings at Halstead's offices, setting up meetings for Plaintiff to attend with insurance inspectors, vendors and the like, and engaging in other forms of supervision via email and telephone; and Defendants Coop, Germano, Halstead and Goberdhan shared jointly the power to hire and fire Plaintiff and the Coop's other employees.

16. For purposes of FLSA and the New York Labor Law, at all times relevant herein, each and every Defendant was an employer of Plaintiff and Plaintiff was an employee of each and every Defendant.

FACTS

17. From approximately February 1995 through April 30, 2013, Plaintiff was employed by Defendants and by Defendant Halstead's predecessor companies as a building superintendent for the 70 unit, five floor cooperative building located at 435 E. 85 St., New York, New York ("the Building"). His regular duties included but were not limited to: cleaning the sidewalk and shoveling snow; cleaning the Building's common areas; cleaning glass and mirrors, mopping the terrazzo and tile floors and stairs; cleaning metalwork; vacuuming the building's common areas; cleaning the laundry machines; cleaning chair-rail moldings in the hallways; changing hallway and common area light bulbs; painting the common areas; checking and clearing four roof drains and six backyard drains; running the garbage compactor; clearing the compactor; emptying the garbage and recycling bins multiple times every day; taking the garbage, recycling and compactor bags, along with bulk items such as discarded furniture, out to the curb for sanitation pickup; monitoring boiler performance; checking boiler fuel, water and oil levels; checking boiler water pressure, testing the boiler's low water shutoff system; flushing the boiler; cleaning the boiler's fuel strainer; adjusting the boiler settings; running the boiler manually when needed; checking the boiler air valves; priming the heating system manually; taking temperature readings in apartments; preparing the boiler for outside boiler cleaners; attending fuel deliveries; attending visits from outside boiler cleaners, mechanics and inspectors; cleaning the electronic eye of boiler smoke alarm; dismantling the boiler alarm system when needed to replace bulbs; replacing fuses when needed; general boiler troubleshooting; arranging for and being present for outside

service personnel appointments, such as compactor cleaning, fire extinguisher testing and washing machine maintenance; responding to and addressing shareholder and tenant complaints and service requests; performing work in shareholder apartments; attending mandated meetings at Defendant Halstead's offices; monitoring shareholder moves in and out of the Building; ordering supplies; monitoring the work of contractors; allowing access for utility employees; accepting packages for shareholders and tenants; and interfacing with Board members, vendors, suppliers and repair persons. In addition, in connection with litigation in which the Coop was involved, he was required to have his deposition taken, and to frequently provide information to, and communicate with, lawyers, as well as DOB inspectors, DOB forensic engineers, and the Building's engineers. Plaintiff was supervised closely by Defendants on a daily, and often hourly, basis. He was not employed in a managerial, administrative or professional capacity. A second employee, Ted Regula, was also jointly employed by Halstead and the Coop during the period from approximately September 2010 to August 2012.

18. During the relevant period, from January 2010 through April 2013, Plaintiff was paid at the rate of approximately $18.11 per hour and was paid only for 40 hours per week even on those weeks he worked more hours than 40, as more fully described below. Plaintiff was also provided with an apartment of about 700 square feet on the first floor of 435 E. 85 St.

19. Throughout Plaintiff's employment, Defendants expected him to work more than 40 hours a week, and Plaintiff regularly worked more than 40 hours a week with the full knowledge of Defendants.

20. Plaintiff customarily worked between 60 and 70 hours per week, from 7:30 AM (or earlier) to about 7:00 PM (or later) on most weekdays and between 10 and 20 hours total on most weekends. In some weeks, for example due to inclement weather conditions, plumbing and/or heating emergencies, or other situations, he worked considerably more than 70 hours per week. He was required to be "on call" 24 hours per day, seven days per week, and occasionally even worked through the entire night, for example during bouts of inclement weather. Plaintiff was never compensated for any hours above 40 until his penultimate week of employment, the week ending April 21, 2013, when he was paid overtime for the very first time (and only time) in his 18 years of employment by Defendants.

21. On information and belief, and at all times relevant herein, Defendants had actual knowledge and/or had reason to believe that Plaintiff customarily worked more than 40 hours per week, and some weeks more than 70 hours per week.

22. Defendant Goberdhan told Plaintiff on more than one occasion that no matter how many hours he worked per week, he would not be paid overtime.

23. For example, in or about July 2012, Plaintiff was presented by Defendant Goberdhan with a job description ("the Original Job Description") which purported to describe Plaintiff's duties in some respects. The Original Job Description stated that Plaintiff's regular workweek was from 8:00 AM to 5:00 PM (with a one hour lunch break), plus removing trash on Saturday and Sunday, but also stated that the job required him to be "on call" seven days a week, 24 hours a day, and available for emergencies "at all times." Plaintiff explicitly refused to sign the Original Job Description, and told both Defendants Goberdhan and Defendant Germano that he believed the above-described

9

requirements violated labor laws. Defendant Goberdhan told Plaintiff that the Original Job Description had been prepared by Defendant Halstead and that the Coop Board was prepared to litigate the question of whether Plaintiff could be compelled to work any hours that he was asked to work without paying him overtime pay. Defendant Germano later admitted to Plaintiff that maybe Defendant Halstead got carried away in preparing the Original Job Description, but it was never withdrawn by any Defendant.

24. Shortly before his termination, on or about February 7, 2013, Plaintiff was instructed by Defendant Goberdhan to sign a different job description ("the February 7 Job Description"). This document stated, in relevant part, "The Building Superintendent is the resident representative of the Owner and the Managing Agent. He is to regard himself as much a part of the Management organization as those in the Management Office."

25. The February 7 Job Description was inaccurate, including but not limited to the fact that it seemed to describe Plaintiff as a managerial employee, since it contained numerous references to his supervising a "staff," even though Plaintiff did not supervise any staff.

26. The February 7 Job Description also stated that although Plaintiff's regular work hours were to be from 8 AM to 5 PM, he was required to be on call 24 hours a day and to arrange for backup assistance from defendant Halstead any time that he left the Building in the evening. It did not mention any meal or other breaks.

27. Based on his good faith belief that Defendants' conduct was unlawful, Plaintiff refused to sign the February 7 Job Description, and told Defendant Goberdhan, and later defendant Germano, that he believed the document was illegal and that the Coop was

violating labor laws by having no overtime policy. Plaintiff told Defendant Goberdhan again that he worked 60-70 hours a week, or more, and had been doing so for the past 18 years. He asked Defendant Goberdhan to calculate exactly how much overtime that came to. Defendant Goberdhan did not deny that Plaintiff worked more than 40 hours per week, but again responded that Plaintiff would not be paid for any overtime hours he worked no matter what the circumstances or how many hours over 40 that Plaintiff worked.

28. On or about three days later, on or about February 10, 2013, Defendant Goberdhan's assistant, another employee of Halstead, instructed Plaintiff that he must complete a time sheet in order to receive his paycheck. This was the very first time Plaintiff was ever provided with a form time sheet and asked to fill it out. On information and belief, Halstead had previously maintained the practice of filling out time sheets on Plaintiff's behalf that showed he worked 40 hours per week, without his signature. On the time sheet presented to Plaintiff on or about February 10, Plaintiff noted that he had never "put in" for overtime in the past. He also noted that he had worked approximately 70 hours that week, carrying out tasks including shoveling snow, taking care of the garbage and compactor and recycling, restarting the boiler early on Sunday morning and dealing with a problem involving rusty water on Sunday evening. He added that on an average weekday he worked 11.5 hours plus further hours on the weekend. Plaintiff received no overtime pay for that week.

29. To his best recollection, until January 2013, Plaintiff did not receive any Notice of Rate of Pay pursuant to the New York Wage Theft Prevention Act. Also in violation of the New York Labor Law, he often worked full days without any meal periods, and

almost invariably worked more than six days per week without a day off. He was never informed of any sick or vacation policy, and in fact was forced by circumstance to pay replacement workers out of his own pocket when he needed to take sick or vacation days or when extra help was required.

30. On or about March 13, 2013, about a month after Plaintiff told Defendant Goberdhan that he believed that the February 7 Job Description was illegal, Defendant Germano and Board Member John Winslow told Plaintiff he was being terminated effective April 30 and asked him to stay on until then to train his replacement.

31. On or about April 30, 2013 a Halstead representative, Jeff Hufnagel, gave Plaintiff a letter on Halstead letterhead, signed by defendant Germano, stating that his employment was terminated effective immediately.

32. Plaintiff was replaced by a less qualified person, who had no experience or training as a building superintendent, little or no knowledge of what the job entailed, and almost none of the skills required. Plaintiff was instructed to train his replacement, and during the course of the training, Plaintiff observed that he appeared to lack even the most basic skills and knowledge required in building maintenance. For example, he requested at one point that the Plaintiff explain to him the difference between clockwise and counter-clockwise, and asked at another point what the differences were between plaster, cement, and mortar.

33. On April 30, Mr. Hufnagel instructed Plaintiff to turn over to his replacement keys to all areas of the Building except for his own apartment.

34. On May 20, 2013, Plaintiff was served with a notice of eviction evicting him from his apartment.

35. Defendants' conduct in terminating Plaintiff's employment and serving the notice of eviction was in retaliation for Plaintiff's assertions that Defendants were violating the labor laws, in violation of New York Labor Law Section 215.

36. Defendants willfully, knowingly and intentionally did not compensate Plaintiff for overtime at a rate of one-and-one-half times his hourly rate of pay for all of the hours he worked in excess of 40 hours a week.

37. Upon information and belief, Defendants knew of, and/or showed reckless disregard for, the practices by which Plaintiff was not paid a rate of one-and-one-half times his hourly rate of pay for all hours worked in excess of 40 hours in a week.

## FIRST CAUSE OF ACTION

38. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1- 37 with the same force and effect as if set forth herein.

39. Defendants' failure to pay Plaintiff overtime was violation of the FLSA, 29 U.S.C. § 207.

40. Defendants' conduct was willful.

## SECOND CAUSE OF ACTION

41. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-40 with the same force and effect as if set forth herein.

42. Defendants' conduct violated New York Labor Law § 215.

## THIRD CAUSE OF ACTION

43. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-42 with the same force and effect as if set forth herein.

44. Defendants' conduct violated the New York Wage Theft Prevention Act, New York Labor Law § 195(1).

## RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A. Declaring that Defendants' conduct violated the Fair Labor Standards Act;

B. Declaring that Defendants' conduct violated the New York State Labor Law;

C. Enjoining Defendants from engaging in further acts of unlawful retaliation against Plaintiff;

D. Ordering Defendants to: reinstate Plaintiff; restore Plaintiff to full seniority with full back pay and benefits to make him whole, cease and desist from any and all acts of retaliation against Plaintiff;

E. Ordering Defendants to pay damages to Plaintiff as follows:

   i. On the first cause of action, full payment of unpaid wages for all hours Plaintiff worked in excess of 40 hours a week, at the rate of one and one half times his then hourly rate of pay, liquidated damages pursuant to 29 U.S.C.A. § 216(b), attorney's fees; interest; and costs and disbursements of this action.

   ii. On the second cause of action, damages for economic loss, including but not limited to, full compensation for all past, present and future lost wages and benefits (including housing); front pay (as an alternative to reinstatement); liquidated damages; interest; reasonable attorney's fees and costs and disbursements of this action; and

   iii. On the third cause of action, damages in the maximum amount

awardable plus reasonable attorney's fees; interest; and the costs and disbursements of this action;

F. On all causes of action, Plaintiff requests such other and further relief as this Court deems necessary and proper.

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action.

Dated: New York, New York
December 18, 2013

                                    RITZ CLARK & BEN-ASHER LLP
                                    Attorneys for Plaintiff
                                    59 Maiden Lane, 39th floor
                                    New York, NY 10038-4668
                                    212-321-7075
                                    mclark@rcbalaw.com

By: _____
       MIRIAM F. CLARK (MFC-2860)